## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

KENDRIX PAUL KELLY,           :
     Claimant,              :
                               :      No. 3:17-CV-1703 (VLB)
     v.                        :
                               :
NANCY A. BERRYHILL, *ACTING*   :      March 25, 2019
*COMMISSIONER OF SOCIAL*    :
*SECURITY*,                     :
     Commissioner.         :

### MEMORANDUM OF DECISION

Claimant Kendrix Paul Kelly ("Mr. Kelly" or "Claimant") challenges the Commissioner of Social Security's final decision to deny his application for disability benefits pursuant to 42 U.S.C. § 405(g). Mr. Kelly moves to reverse or remand the decision, arguing that Administrative Law Judge Robert A. DiBiccaro's (the "ALJ" or "ALJ DiBiccaro") findings are not supported by substantial evidence in the Record and/or were not rendered in accordance with law. Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner"), moves to affirm the Commissioner's final decision. For the reasons stated below, the Court DENIES Commissioner's motion and GRANTS Claimant's motion to remand for further consideration at Step Five of the SSA analysis.

### Background

Mr. Kelly was born in 1985 and is a military veteran of the Gulf War Era who served in Iraq and Afghanistan and was discharged from the army in 2007. [R. 51, 567].[1] Mr. Kelly alleged in his initial disability application that he has been unable

---

[1] Citations to the record, [Dkt. 13], are identified as [R. ___].

to work since February 2011, when he ceased working as a sales associate, due to PTSD, bipolar disorder, and a back condition. [R. 302-03]. Mr. Kelly has three relatively small children at home. [R. 1280]. Starting in May 2012, Mr. Kelly has been seen by medical professionals primarily at the Veterans Affairs Medical Center ("VAMC") in Connecticut for a variety of conditions. [R. 463]. There is a gap in his treatment between September 2012 and March 2014, during which time Mr. Kelly was incarcerated in Alaska. [R. 557].

I.  Medical History[2]

On June 12, 2012, Mr. Kelly saw advanced practice registered nurse ("APRN") Michel Coral at the department of Veterans Affairs (VA) PTSD Clinic for an initial visit. [R. 443]. At that time, Mr. Kelly lived with his grandmother and three uncles and had a fiancée who was pregnant with his second child. [R. 443]. Mr. Kelly lived in a "crime ridden area" and had witnessed a number of traumatic events, including his friend get shot in their neighborhood and a fellow soldier kill himself. [R. 443]. Mr. Kelly attempted suicide by overdose while in the military and had suicidal thoughts which he had shared with his girlfriend in the past but denied any current suicidal ideation. [R. 443]. Mr. Kelly noted that he had pursued a job at Walmart "but had to walk out due to not being able to tolerate all the people inside." [R. 443]. He also said he completed a training program to work as a patient care assistant but was unable to do the job because of back spasms. [R. 444]. The

---

[2] The parties did not file a joint stipulation of facts as required by the social security standing order. *See* [Dkt. 15]. In the absence of a stipulation, the Court relied instead on the facts included by each party along with their motions and supplemented by the record.

back pain, for which he took Meloxicam with little relief, dates back to surgery to remove a cyst. [R. 444]. Mr. Kelly also took Sertraline to help with his mood and nightmares, but he still experienced some issues. [R. 444]. APRN Coral recommended increasing the dosage and exploring other medications. [R. 444]. She also issued a mental health care plan, with a goal of finding employment he could maintain. [R. 442].

Mr. Kelly saw APRN Margaret Becker at the VAMC Primary Care Clinic on June 14, 2012. [R. 436-39]. APRN Becker noted wheezing when Mr. Kelly exercised, which improved with Symbicort, and chronic mid-back pain, which was not responding to Meloxicam but experienced some temporary relief with chiropractic treatments. [R. 435]. APRN Becker noted that Mr. Kelly may experience asthma because he was not taking his medication and encouraged compliance. [R. 438]. APRN Becker noted that Mr. Kelly's PTSD seemed to be better as a result of his resuming the Sertraline and care with APRN Coral. [R. 435]. Mr. Kelly reported that his PTSD had improved following adjustment of his medication during a June 22, 2012 visit with APRN Becker. [R. 438]. She further advised Mr. Kelly that his "asthma and lower back pain do not represent a disability – he is able to work from that perspective." [R. 440].

Mr. Kelly saw APRN Coral on July 3, 2012. [R. 429]. He told APRN Coral that the Sertraline was helping with his nightmares and to control his anger, though he admitted he was missing doses. [R. 429]. APRN Coral told Mr. Kelly that the Sertraline was not habit forming and instructed him to follow the dosing instructions. [R. 429].

During a visit on July 25, 2012, APRN Coral noted that Mr. Kelly appeared less depressed, but he still reported nightmares, anxiety, and hypervigilance in crowds. [R. 422-23]. APRN Coral increased Mr. Kelly's Sertraline dosage and prescribed Prazosin. [R. 423].

Mr. Kelly met with personnel at the VA's Compensated Work Therapy (CWT) Support Employment Program around the same time. A CWT peer specialist noted on August 6, 2012 that Mr. Kelly expressed being open to any kind of employment, noting that he wanted to look into Walmart because he had worked there previously and had positive relationships with the staff. [R. 420]. Walmart declined to rehire Mr. Kelly because of past discrepancies with his time card, but Mr. Kelly was interested in a deli or seafood worker position with another employer. [R. 417-18].

On September 12, 2012, Mr. Kelly again saw APRN Coral. He told her that he had not yet found a job but planned to continue looking. [R. 411]. He also planned to start mechanic classes in October, telling APRN Coral that he would use his GI bill or take out loans if needed. [R. 411]. APRN Coral encouraged his efforts and provided potential resources for assistance. [R. 411]. Mr. Kelly also said he was interested in involving a lawyer with his social security disability application, in hopes of a large retroactive check so he could move out of his grandmother's house. [R. 11]. APRN Coral encouraged Mr. Kelly to apply for a residential program which would provide helpful transitional support and structure. [R. 411].

Mr. Kelly returned to APRN Coral on March 6, 2014, following his release from prison in Alaska. [R. 407-08]. Mr. Kelly had been on medication while incarcerated but had not taken anything since returning to Connecticut in early

4

February. [R. 407-08]. Mr. Kelly and his girlfriend reported that he had depression alternating with agitation and anger and had significant mood swings, including an incident when Mr. Kelly took thirteen Percocet pills and held a knife to his own throat following a fight with his mother, which prompted the visit to APRN Coral. [R. 407-08]. APRN Coral offered Mr. Kelly voluntary admission for stabilization but he declined. [R. 407-08]. APRN Coral noted that Mr. Kelly did not display psychotic symptoms but that "his hypervigilance borders on paranoia." [R. 408]. She started Mr. Kelly on an aggressive medication regimen, prescribing Depakote, Prazosin, and Bupropion. [R. 408].

During the same visit, Mr. Kelly noted that a previous girlfriend with whom he had a child was in trouble and he wanted to be able to take the child if the court deemed her unfit. [R. 408]. APRN Coral said she would not be comfortable with that at the current time, but they could reevaluate the situation when he was stable. [R. 408]. Mr. Kelly also noted that he was hiring a lawyer to assist him in applying for social security disability benefits "as he feels unable to cope with working." [R. 408]. During a visit five days later, Mr. Kelly reported feeling "a lot more mellow" with no serious anger outbursts. [R. 902]. He reported sleeping better but was still experiencing some depression. [R. 902]. Mr. Kelly also said that he had filled out the social security disability paperwork, and APRN Coral said she would fill out the form when she received it. [R. 902].

On March 20, 2014, Mr. Kelly reported to APRN Coral that he had improved on the new regimen—sleeping better with no outbursts and generally calmer. [R. 901]. He told her that he was "anxious to complete SSD paperwork," stating that

he felt unable to work at that time but could consider vocational rehabilitation once he is more stable. [R. 901].

Following a primary care visit on March 24, 2014 and review of laboratory results, APRN Becker recommended further evaluation for possible hyperthyroidism. [R. 898].

Mr. Kelly saw APRN Coral again on April 1, 2014, during which APRN Coral recommended Benadryl for Mr. Kelly's reported insomnia. [R. 892]. APRN Coral noted that Mr. Kelly would continue the psychotropic regiment "as he finds it helpful to manage his labile mood/anger." [R. 892]. APRN Coral noted that she had not seen the social security form yet and Mr. Kelly said he would ask his case worker to fax it to her. [R. 892]. APRN Coral received the form and filled it out the next day. [R. 555].

During an April 23, 2014 visit with APRN Coral, Mr. Kelly reported having continued issues with mood swings, including becoming withdrawn and isolative after taking his second dose of Bupropion in the afternoon. [R. 648-49]. APRN Coral noted that it was unclear whether this was due to ongoing mood dysfunction or over-sedation and reduced his medication dosage. [R. 648]. Mr. Kelly also said he was anxious about his thyroid issues. [R. 648].

Mr. Kelly met with Dr. Magdalena Bogun, an endocrinology fellow, on May 5, 2014, at the VAMC. [R. 645-58]. Dr. Bogun indicated that Mr. Kelly's symptoms, including increased heart rate and very mild tremor, were consistent with hypothyroidism, and test results were also consistent with Grave's disease. [R. 571-75, 646].

The Claimant saw APRN Coral on May 22, 2014.  [R. 883].  APRN Coral notes that Mr. Kelly was mildly pressured and talkative, but that he said "he feels his meds are helping greatly with sleep, anger and mood."  *Id.*  She also noted that Mr. Kelly was about to start taking medication for Grave's disease, warranting additional monitoring of his mood and mental status.  *Id.*  APRN Coral's notes from the visit state that Mr. Kelly was "[v]ery focused on getting SSD as a way to help him stabilize and work toward longer range goals; he wants to go to school for both automotive repair and cooking, both of which he loves to do, and then decide which career he wants to pursue."  *Id.*  She further notes that "[i]t isn[']t clear what his chances are of receiving SSD."  *Id.*

Mr. Kelly had a follow-up appointment with Dr. Bogun on June 3, 2014, during which Mr. Kelly reported that his symptoms were much improved—he felt less anxious and while he still got tired, he believed that was due to a lack of sleep.  [R. 641-43].

Mr. Kelly underwent a consultative examination with Dr. Frank Mongillo on June 9, 2014.  [R. 564-67].  After examination, Dr. Mongillo concluded that, physically, Mr. Kelly "could certainly do light to moderate work."  [R. 567].  Mr. Kelly was assessed by Dr. Earl Sittambalam, a medical consultant, on June 12, 2014, who concluded that Mr. Kelly could perform a range of medium work.  [R. 142-43].

During a visit with APRN Coral on June 27, 2014, Mr. Kelly reported that he had been "turned down again by SSD" and "feels he can't work competitively because he gets panicky and angry around other people."  [R. 622].  APRN Coral noted that Mr. Kelly has "many job skills he could use," further noting that "he is

also applying to take culinary arts at Gateway, his main wish is to be a chef." *Id.* She encouraged Mr. Kelly to call CWT. [R. 858]. At the same visit, Mr. Kelly admitted to "playing with the dosages of his meds," including taking his Bupropion erratically because he thought it made him tired, though he also admitted to taking Benadryl in the morning and at night. *Id.* APRN Coral discontinued the Bupropion and urged him to take full doses of his other medications as directed. *Id.*

In her August 6, 2014 chart entry, APRN Coral notes that Mr. Kelly was "complaining of on-going insomnia and some mild irritability/withdrawal" and as a result adjusted Mr. Kelly's medication dosage. [R. 616-17]. She noted that it was "[n]ot entirely clear how much of his symptoms are thyroid driven." *Id.*

The Claimant underwent an initial PTSD evaluation with Dr. Elbert G. Richardson on October 4, 2014. [R. 836]. Mr. Kelly indicated that he had nearly every symptom of PTSD listed under diagnostic criteria and Dr. Richardson diagnosed Mr. Kelly with PTSD. [R. 839-41].

On October 28, 2014, Mr. Kelly visited APRN Coral. [R. 833]. He remained focused on getting benefits, giving APRN Coral another evaluation form. *Id.* During the visit, Mr. Kelly requested to be referred back to CWT. *Id.*

Mr. Kelly had a follow-up visit with an endocrinologist, Dr. Perdigoto, on November 3, 2014. [R. 830-32]. Mr. Kelly had stopped taking his Methimazole when he became sick, potentially with the flu, but reportedly started taking his Atenolol again, which resulted in less palpitations and tremors. [R. 830]. Dr. Perdigoto saw Mr. Kelly again on December 1, 2014, when Mr. Kelly reported feeling sleepy and

gaining significant weight. [R. 824-26]. Mr. Kelly's doctors appeared to favor definitive treatment, surgery or radiation, for his thyroid condition. *Id.*

APRN Coral saw Mr. Kelly on November 25, 2014, noting that he "[a]ppeared in good spirits" and had been "granted 50% [service connected] for [PTSD], and will get a retro[active] check in the mail." [R. 827]. Mr. Kelly "asked for info[rmation] on starting school after the holidays." *Id.* APRN Coral reported that Mr. Kelly "is still pursuing social security disability and has a lawyer involved now, but hopefully will still work on getting education and a job at some point." *Id.*

APRN Coral noted in relation to a January 7, 2015 appointment that Mr. Kelly "admitted he has been off psych meds, not clear why he stopped but this has been an ongoing issue. I put them back in for him with an up-tapering schedule and urged him to comply." [R. 822].

The Disability Determination Explanation for Mr. Kelly's disability reconsideration relied in part on opinions from Dr. Robert Decarli and Dr. Robert Mogul, both agency medical consultants, following consultative examinations in January 2015. *See* [R. 163-77]. Mr. Kelly had initially been seen by Drs. Sittambalam, Hill, and Mongillo in April and June 2014. *See* [R. 166]. On January 30, 2015, Dr. Robert Mogul concluded that Mr. Kelly was physically capable of a range of medium work. [R. 170-72]. On January 21, 2015, Dr. Decarli determined that Mr. Kelly was mentally capable of performing simple work. [R. 172-74]. Dr. Decarli observed that Mr. Kelly had shown improvement with treatment and was stable on his medication. [R. 174].

In late February 2015, Mr. Kelly was hospitalized at the VAMC for symptoms attributed to gallbladder sludge, which would later require surgery. [R. 772-818, 1045-49]. Doctors determined that Mr. Kelly was non-compliant with his medication for Grave's disease and posited that "RAI [radioactive iodine] ablation may be better with some chance of preserving thyroid function keeping in mind medication noncompliance." [R. 1047].

Mr. Kelly began physical therapy on March 23, 2015 to address his complaints of lumbosacral radiculopathy down to the backs of his knees, consistent with "disk involvement and muscle spasms, causing pain, decreased range of motion and muscle performance." [R. 1024-26]. The condition improved with Tylenol, exercise, and electric stimulation. [R. 1024]. Mr. Kelly had several additional rounds of physical therapy. [R. 1025, 1014-15, 1006-07, 991-92, 997-98, 999-1000, 1156-59]. During the fourth session, a home traction unit was prescribed. *Id.*

In April 2015, Mr. Kelly was treated for his gall bladder and thyroid issues, including radioactive iodine treatment so that the gall bladder surgery could take place. [R. 1008-13]. Also in April, Mr. Kelly underwent audiological evaluation for complaints of tinnitus and loss of hearing, which showed hearing within normal limits and excellent speech recognition ability. [R. 1002].

During a May 21, 2015 primary care clinic appointment with Dr. William Johns, Mr. Kelly reported improvement in his abdominal pain and hyperthyroid symptoms. [R. 993]. Dr. Johns said he would refer Mr. Kelly for surgical consultation once Mr. Kelly was euthyroid (having a normal functioning thyroid).

[R. 995]. At the same appointment, Mr. Kelly complained of back pain—he had gained significant weight and had been lifting children—and requested narcotics. [R. 993-95]. Dr. Johns recommended tapering Mr. Kelly off of narcotics and suggested he may need a physiatry referral. *Id.* On May 29, 2015, the physical therapist deemed Mr. Kelly to have reached maximum benefit from physical therapy after the sixth and final session and Mr. Kelly was discharged. [R. 992].

Mr. Kelly saw Dr. Perdigoto on June 15, 2015. [R. 988]. Dr. Perdigoto noted Mr. Kelly's general noncompliance with his medications and getting blood work done. *Id.* He further noted that Mr. Kelly appeared overall euthyroid that day but that some of his symptoms pointed to hyperthyroidism and hypothyroidism. *Id.* Dr. Perdigoto emphasized to Mr. Kelly the importance of getting bloodwork done until he achieved euthyroid state. *Id.*

Mr. Kelly also saw physiatrist Dr. John W. O'Brien on July 15, 2015 regarding his back pain. [R. 978-83]. Dr. O'Brien recommended a home exercise program and noted that Mr. Kelly's functional status had no limitations. [R. 979].

During Mr. Kelly's hearing loss and tinnitus evaluation on August 12, 2015, he reported that the condition was "bothersome to him." [R. 1296-1301]. The assessment concluded that he had normal hearing and that any impairment did not meet the criteria to be considered a disability for the VA and would not impact ordinary conditions of daily life, including ability to work. [R. 1299].

Mr. Kelly had an appointment with Dr. Johns on August 28, 2015 and reported that he had no abdominal symptoms at that time. [R. 1283]. He again requested narcotics for back pain but also admitted to using marijuana, via a marijuana card,

for his PTSD. *Id.* During a November 17, 2015 visit with Dr. Johns, he recommended another physiatry reevaluation for Mr. Kelly, as Mr. Kelly had been prescribed opioids for his back pain but seemed not to be taking them. [R. 1263].

Mr. Kelly saw APRN Coral again on December 11, 2015, after a year of no contact, reportedly because Mr. Kelly "didn['t feel the need to come in or take psych meds because he thought he was doing well." [R. 1259]. He returned because his son had behavioral problems and Mr. Kelly reported having a hard time dealing with the stress. *Id.* APRN Coral noted that no psychiatric medication was indicated at that time and also noted that Mr. Kelly's toxicology screen was negative. *Id.* Mr. Kelly had been prescribed Percocet for his back pain but after additional screens indicating he was not taking the medication, it was determined at a January 11, 2016 visit that he was "no longer suitable for continued use of a controlled substance [due to] concern of diversion." [R. 1243].

Mr. Kelly returned to see APRN Coral on April 6, 2016, requesting "a letter" to give DCF. [R. 1230-31]. Mr. Kelly still stated that he felt like he did not need psychiatric medication and mentioned that he had been going to school to become an exterminator. *Id.* He also mentioned his interest in cooking, noting that he "hasn['t settled on a clear path to employment" yet. *Id.* APRN Coral noted that Mr. Kelly showed no signs of depression or mania and that Mr. Kelly said he was not troubled by PTSD symptoms currently. *Id.* APRN Coral noted that "[a]t last contact [Mr. Kelly] was trying to get rated as permanently unemployable by VA and also get SSD." *Id.* She noted that Mr. Kelly "now has a 70% rating, which he was trying to get as permanent and total and was trying to get SSD; however he still

talks about schooling and jobs so unclear what his work capacity actually is." *Id.* She also noted that it was "unclear what he wants from VA other than documentation to help [him with] whatever court cases he is facing." *Id.*

## II. ALJ Decision

On March 7, 2014, Mr. Kelly applied for disability insurance benefits and supplemental security income citing an onset date of February 1, 2011. [R. 166-276]. His claims were initially denied on June 19, 2014 and on reconsideration on February 3, 2015. [R. 194-201, 208-223]. He thereafter requested a hearing, which was held before ALJ DiBiccaro on June 30, 2016. [R. 61-132].

ALJ DiBiccaro conducted a hearing after which he rendered an opinion on February 1, 2017, denying Mr. Kelly's request for disability insurance benefits. [R. 11-26]. ALJ DiBiccaro's conclusions are as follows.

ALJ DiBiccaro found that Mr. Kelly had not engaged in substantial gainful employment since his onset date of February 1, 2011. [R. 14]. He determined that Mr. Kelly suffered from multiple severe impairments, including bilateral hearing loss, tinnitus, post-traumatic stress disorder, personality disorder, lumbar radiculopathy, Grave's disease (hyperthyroidism), asthma, and bipolar disorder. [R. 14]. ALJ DiBiccaro concluded that Mr. Kelly's severe impairments did not individually or collectively meet or medically equal the severity of a listed impairment under 20 CFR Part 404, Subpart P, Appendix 1. [R. 14]. Mr. Kelly does not challenge any of these findings.

ALJ DiBiccaro then determined that Mr. Kelly has the residual functional capacity ("RFC") to perform light work defined as involving:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b) and 416.967(b). In addition, the ALJ imposed the following limitations:

> The claimant can occasionally balance, crouch, stoop, bend, crawl, kneel, and climb; can never climb ladders or scaffolds; can frequently handle, finger, and feel with his upper extremities; can work in a setting free of concentrated exposure to dust, gases, fumes, chemicals, and other respiratory irritants; can work in a setting free of concentrated exposure to extreme heat, extreme cold, and humidity; can work in a setting free of hazards, such as dangerous machinery and unprotected heights; can work in a setting free of loud background noises; can occasionally interact with supervisors and co-workers and those interactions should be brief and superficial; can work in a setting where he can avoid teamwork or close collaboration with others; can work in a setting free of interaction with the general public; and can perform work that requires less than 30 days to learn and involves only routine, repetitive tasks.

[R. 16].

In making this evaluation, ALJ DiBiccaro considered "all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments." [R. 17]. First, he evaluated Mr. Kelly's credibility. He found that Mr. Kelly's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [R. 17].

Next, ALJ DiBiccaro considered the medical opinions, granting "some weight" to the consultative examination of Dr. Frank Mongillo; "little weight" to the mental impairment questionnaire completed by treating source APRN Michel Coral, and signed by attending medical doctor, Dr. Dolores Vojvoda; and "significant weight" to the Veterans Administration's disability rating.  [R. 20-22].  ALJ DiBiccaro also evaluated the opinions of Mr. Kelly's other medical sources: giving "little weight" to the additional mental impairment questionnaires completed by treating medical source APRN Coral and "little weight" to the physical functional capacity assessment and mental function capacity assessment provided by the agency medical consultants at the initial and reconsideration levels.  [R. 22-23].

ALJ DiBiccaro next concluded that Mr. Kelly has no past relevant work.  [R. 24].  He also determined that Mr. Kelly was a "younger individual," age 25, at the alleged disability onset date, who has a high school education and is able to communicate in English.  [R. 24].  Considering Mr. Kelly's age, education, work experience, and RFC, the ALJ determined that there are jobs existing in significant numbers in the national economy that Mr. Kelly can perform.  [R. 24].

In coming to this conclusion, ALJ DiBiccaro relied on the testimony of a vocational expert, Mr. Calandra.  Based on the ALJ'S hypothetical, which asked him to assume, among the other RFC limitations, that the person would only be able to perform "{o}ccasional reaching, with the nondominant left upper extremity and no reaching overhead with the left upper extremity [and] [f]requent use of the upper extremities for handling, fingering and feeling," Mr. Calandra opined that Mr. Kelly would be able to perform the requirements of representative occupations

such as mail clerk, with 100,000 positions nationally, assembler, with 900,000 positions nationally, and solderer, with 50,000 positions nationally.  [R. 14-15, 24-25].

The ALJ removed the hypothetical reaching limitation from Mr. Kelly's RFC in light of the clinical records from the VA showing no limitations to Mr. Kelly's left shoulder.  [R. 25].  The ALJ still considered the vocational expert's opinion, as the hypothetical presented was more limited than Mr. Kelly's final RFC determined by the ALJ.  [R. 25].  The ALJ declined to accept the vocational expert's opinion that a person with Mr. Kelly's RFC could perform work as a solderer or assembler given that both jobs involve loud background noise, but accepted the vocational expert's opinion that such a person could perform work as a mail clerk.  [R. 25].

ALJ DiBiccaro considered and overruled Mr. Kelly's objections to the vocational expert's testimony regarding his absence from the rest of the hearing, as to his qualifications, and as to his methodology.  [R. 25].  Specifically, the ALJ overruled Mr. Kelly's objection as to the expert's methodology explaining that "the vocational expert described in detail his methodology for determining the numbers of jobs available, and the undersigned is satisfied Mr. Calandra's methodology is sound."  [R. 25].

Based on all of the above, ALJ DiBiccaro concluded that Mr. Kelly had not been under disability, as defined by the Social Security Act ("SSA"), from February 1, 2011 through the date of his decision.  [R. 25].

This appeal ensued on October 10, 2017 and was fully briefed on April 20, 2018.

<u>Discussion</u>

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. Id.; *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position*. Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

Thus, "[i]n reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1). An "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment must be one which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner:

1.  First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2.     If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3.     If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4.     If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5.     Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

A claimant's residual functional capacity ("RFC") is determined by the ALJ's assessment of the claimant's capacity to work, taking into consideration the extent to which the claimant's impairment(s) and related symptoms limit what the claimant can do in a work setting. 20 C.F.R. §§ 404.1545; 404.1546. A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[3] SSR 96–8p, 1996 WL 374184, at *2.

--------

[3] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3)

"A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1).

RFC is  a comprehensive "assessment based upon all of the relevant evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a). An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). While the claimant has the general burden of proving his or her disability within the meaning of the Act, at Step Five, the burden shifts to the Commissioner to show that there is other work that the claimant can perform.

---

"whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

*McIntyre*, 758 F.3d at 150 (citing *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam)).

Here, Mr. Kelly challenges ALJ DiBiccaro's finding that Mr. Kelly was not disabled within the meaning of the Act from February 1, 2011 through February 1, 2017, the date of the Commissioner's decision. In particular, Mr. Kelly argues that ALJ DiBiccaro did not follow the treating physician rule by giving little weight to the opinions of APRN Coral and Dr. Vojvoda and the State Agency document-reviewers, by purporting to give "great weight" to the VA's disability rating but seemingly going against its conclusions, and by failing to give meaningful consideration to the opinions of Drs. Richardson and Connolly. [Dkt. 21 at 21-22]. Additionally, Mr. Kelly argues that ALJ DiBiccaro's vocational findings are flawed due to his reliance on the testimony of vocational expert ("VE") Mr. Calandra, who had not heard the testimony regarding Mr. Kelly's conditions but only answered the ALJ's hypothetical and whose methods Mr. Kelly argues are flawed. *Id.* at 31-38.

I. <u>Evaluation of Opinion Evidence – Treating Physician Rule</u>

The SSA recognizes a "treating physician" rule of "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). However, SSA regulations advise that a treating source's opinions "on the issue(s) of the *nature and severity of [the claimant's] impairment(s)*" will be given "controlling weight" if the opinion is "well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(r); *see also Green-Younger*, 335 F.3d at 106.

Thus, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal citations omitted) (citing *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). An ALJ who declines to give controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give the opinion. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* Additionally, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

### a. APRN Coral's Opinions

APRN Coral provided three mental impairment questionnaires regarding Mr. Kelly, dated April 2, 2014, November 5, 2014, and January 7, 2015, the first of which

was also signed by Dr. Vojvoda.  [R. 552-555, 712-15, 718-20].  In each, APRN Coral opined that Mr. Kelly had marked to extreme issues with adaptation, social interaction, sustaining concentration, and understanding and memory.  *Id.*  ALJ DiBiccaro determined that the assessment by APRN Coral and signed by the Dr. Vojvoda would be given "little weight" because the opinions were not consistent with the longitudinal record evidence.  [R. 20].  Mr. Kelly argues that there is a "lack of substantial evidence contradicting the stated opinions of APRN Coral and Dr. Dolores Vojvoda," and the ALJ should therefore have given the opinions controlling weight.  [Dkt. 21-1 at 27].  Additionally, Mr. Kelly asserts that the ALJ had a duty to get more information from the treating physician in order to reconcile inconsistencies.  *Id.* at 29.

First, the Court notes that APRN Coral, a nurse, is not an "acceptable medical source." 20 C.F.R. § 404.1502.  The treating physician rule therefore does not apply to her opinion.  *Bushey v. Colvin*, 552 F. App'x 97, 97-98 (2d Cir. 2014).  Consequently, her opinion is not entitled to controlling weight.  *See id.*; 20 C.F.R. §§ 404.1502, 404.1513, 404.1527, 416.902, 416.913, 416.927.  The fact that Dr. Vojvoda signed the April 2, 2014 questionnaire does not impact this conclusion.  *See* [R. 555].  There is no evidence that Dr. Vojvoda examined Mr. Kelly, and certainly not to the extent required to be considered a treating physician.  As such, the presence of her signature does not entitle said questionnaire to controlling weight.  *See Monguer v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

The Commissioner must evaluate every medical opinion received regardless of the source.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).  "Medical

opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions. 20 C.F.R. § 404.1527(A)(1). Because APRN Coral rendered a medical opinion, even though she is not an "acceptable medical source," the ALJ evaluated her opinions and stated what weight he gave them using the prescribed factors.

With those factors in mind, ALJ DiBiccaro granted "little weight" to the mental impairment questionnaires completed by APRN Coral. [R. 20-22]. ALJ DiBiccaro explained that the extremity of the limitations APRN Coral attributed to Mr. Kelly suggested that he should be institutionalized or have a conservator managing his affairs, while the record shows that Mr. Kelly has had only sporadic mental health treatment and showed improvement when taking his medication consistently. [R. 20]. ALJ DiBiccaro also emphasized that it was difficult to reconcile APRN Coral's opinion that Mr. Kelly has serious to very serious problems in all areas of task performance with the fact that Mr. Kelly was actively seeking work, completed a four-week certification course, and spent multiple hours a day writing poetry. [R. 21]. ALJ DiBiccaro concluded that APRN Coral had not provided a persuasive rationale supported by evidence to justify her opinion that Mr. Kelly had such extreme limitations which render him essentially nonfunctional. *Id.*

After careful consideration of the entire record and the ALJ's opinion, the Court concludes that ALJ DiBiccaro properly assessed APRN Coral's opinions.

ALJ DiBiccaro provided good reasons supported by substantial evidence for the weight given the APRN Coral's opinion.

APRN Coral reported that Mr. Kelly had frequent problems or limited ability to use good judgment, use coping skill, handle frustration, respond appropriately to others, get along with others, carry out multiple-step instructions, focus long enough to finish simple activities or tasks, change from one simple task to another, and perform basic activities at a reasonable pace. [R. 552-555, 712-15, 718-20]. Meanwhile, APRN Coral's treatment notes suggest that Mr. Kelly had the ability to take care of his children, pursue employment options, attend mechanics courses, apply for cooking school, and write poetry. *See supra* at p. 2-13. Mr. Kelly argues that APRN Coral's notations of such activities and interests do not evidence the kind of capabilities the ALJ concluded such that APRN Coral's opinion was contradicted. *See* [Dkt. 21 at 24]. For instance, Mr. Kelly's Motion argues that the record does not indicate how many days a week or hours a day Mr. Kelly's mechanic classes were or that Mr. Kelly's writing was "anything other than gibberish." *Id.* While ALJ DiBiccaro could have come to such conclusions based on the record, it was reasonable for him to conclude otherwise. Presence of alternative interpretations of the record evidence does not require reversal of the ALJ's decision. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.")

APRN Coral's notes also reflect Mr. Kelly's interest in a career and obtaining additional education in his passion areas—automotive repair and cooking. APRN

Coral's notes do not suggest that she discouraged Mr. Kelly from such aspirations but show that she believed that Mr. Kelly had plenty of job skills and referred him to the VA's Compensated Work Therapy (CWT) Support Employment Program. *See, e.g.,* [R. 420]. Mr. Kelly's lack of success through CWT was not due to severe disability and complete inability to work, but rather, APRN Coral's notes indicate issues resulting from Mr. Kelly's criminal record. *See* [R. 421-22, 426]. Additionally, Mr. Kelly also sought work at Walmart, but the company declined to rehire Mr. Kelly because of past discrepancies with his time card. [R. 417-18]. APRN Coral's treatment notes reasonably weigh against a finding of total disability and support the ALJ's decision. *See Cichocki*, 729 F.3d at 178; *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009).

Additionally, as the ALJ noted, the record shows that Mr. Kelly's mental health condition improved when he complied with his treatment plan. Mr. Kelly offers no evidence to contradict this finding. When Mr. Kelly saw APRN Coral in December 2015 for the first time in over a year, he indicated that he was doing well and felt he did not need medication. [R. 1259]. Mr. Kelly returned to see APRN Coral on April 6, 2016, requesting "a letter" to give DCF. [R. 1230-31]. Mr. Kelly stated that he felt he did not need psychiatric medications and mentioned that he had been going to school to become an exterminator and again mentioned his interest in a career in cooking. *Id.* APRN Coral's notes from that visit indicate that Mr. Kelly showed no signs of depression or mania and that Mr. Kelly said he was not troubled by PTSD symptoms. *Id.* This evidence suggests that Mr. Kelly did not need mental health treatment for long periods of time and also suggests that he

only returned to APRN Mr. Kelly in order to get additional documentation for his child custody and SSD cases.

Because substantial evidence contradicted APRN Coral's assessments, ALJ DiBiccaro accordingly discounted the weight given to those opinions. ALJ DiBiccaro properly considered the relevant factors in deciding to give APRN Coral's opinions little weight. ALJ DiBiccaro's findings of improvement to Mr. Kelly's mental condition were based on substantial evidence and supports the ALJ's conclusion that Mr. Kelly is not disabled. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). Mr. Kelly's arguments to the contrary, *see* [Dkt. 21 at 22-25], offer alternative interpretations of the record, but by no means convince this Court that ALJ DiBiccaro's conclusions were not support by substantial evidence.

## II. Evaluation of Opinion Evidence – Other Opinions

All other opinion evidence highlighted by Mr. Kelly, *see* [Dkt. 21 at 20-22], are non-treating opinion evidence. This includes the consultative examination of Dr. Mongillo [R. 566-69], the State Agency medical consultants' physical functional capacity assessments [R. 133-46, 163-76], and the State Agency medical consultants' mental functional capacity assessments [R. 133-46, 163-76]. Mr. Kelly seems to suggest that these opinions did not receive the meaningful consideration they deserved. *See* [Dkt. 21 at 22]. The Court disagrees. ALJ DiBiccaro considered the factors guiding the determination of how much weight to give to medical opinions of non-treating physicians and substantial evidence supports his conclusions.

Dr. Mongillo examined Mr. Kelly on June 9, 2014 and concluded that Mr. Kelly "could certainly do light to moderate work." [R. 564-67]. In assessing Dr. Mongillo's opinion, the ALJ recognized that Dr. Mongillo was not a specialist and did not treat Mr. Kelly but accounted for the fact that Dr. Mongillo performed a thorough physical examination of Mr. Kelly. Additionally, the ALJ noted that Dr. Mongillo's opinion was consistent with Mr. Kelly's testimony as well as the objective medical evidence. Accordingly, ALJ DiBiccaro granted "some weight" to the opinion. The Court concludes that this decision was consistent with the law and supported by substantial evidence. Because Dr. Mongillo was not a treating physician his opinion was not entitled to controlling weight. The other factors indicate that the opinion deserved some weight, as ALJ DiBiccaro concluded.

The ALJ granted "little weight" to the physical functional capacity (PFC) assessments and mental functional capacity (MFC) assessments provided by the State Agency medical consultants at the initial and reconsideration levels for good reason. [R. 23]. Drs. Sittambalam and Hill performed the physical and mental residual functional capacity assessments during Mr. Kelly's initial review and Drs. Mogul and Decarli performed the assessments on reconsideration. *See* [R. 133-146, 163-177]. At both the initial and reconsideration stages, the doctors concluded that Mr. Kelly's "condition results in some limitations to [his] ability to perform work related activities" but "is not severe enough to keep [him] from working." [R. 146, 176]. Their assessments are relatively consistent with the ALJ's and indeed would have counseled fewer restrictions on Mr. Kelly's ability to work.

It is unclear how Mr. Kelly believes these opinions should have been valued or would support the argument that he is unable to work. Regardless, ALJ DiBiccaro explained that the consultants did not treat or examine Mr. Kelly and did not have access to the more recent evidence submitted at the hearing level in formulating the evaluations. *Id.* Additionally, ALJ DiBiccaro noted that the PFC assessment was not consistent with Dr. Mongillo's opinion that Mr. Kelly could perform light work. *Id.* Accordingly, ALJ DiBiccaro considered the assessments but gave them little weight and evaluated the entirety of the record to come to his conclusion that Mr. Kelly could perform light work with certain limitations. *Id.*

The Court concludes that ALJ DiBiccaro's treatment of the non-treating physician medical evidence was legally appropriate and supported by substantial evidence in the record.

### III.   Evaluation of the Compensation and Pension Rating

In connection with Mr. Kelly's application for veterans' compensation benefits, the VA conducted assessments regarding Mr. Kelly's disabilities and ability to work. As part of this process, the VA conducted PTSD assessments on Mr. Kelly. Ultimately, the VA determined that he is 70% disabled and 100% unemployable. *See* [R. 50-60]. Mr. Kelly argues that ALJ DiBiccaro failed to give appropriate weight to that rating.

Determinations of other governmental agencies that a social security disability benefits claimant is disabled are not binding on the ALJ. *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975); *Hankerson v. Harris*, 636 F.2d 893, 896-97 (2d Cir. 1980). Such decisions are entitled to *some* weight but are not

conclusive or even entitled to great weight. *Id.* The VA determination is another piece of evidence to be weighed by the ALJ along with the oral testimony and medical evidence. *Id.*; *see also Machia v. Astrue*, No. 2:08-cv-103, 2009 WL 3806326, at *9 (D. Vt. Nov. 16, 2009) ("The point of the Second Circuit's admonition to accord VA determinations 'some weight' is that in addition to oral testimony and medical evidence, VA rating decisions are another item to be placed on the evidentiary scale."); *Fitzgerald v. Astrue*, 2:08-cv-170, 2009 WL 4571762, at *6 (D. Vt. Nov. 30, 2009) (same). This allows the ALJ to account for the differences between the criteria used in the VA and the SSA programs for determining disability and ability to work. *See Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006) ("[T]he Department of Veterans Affairs requires less proof of disability than the Social Security Administration does."). The ALJ makes the ultimate disability determination based on the entirety of the evidence in the record.

While Mr. Kelly admits that the VA decision is not entitled to controlling weight, Mr. Kelly seems to argue that, because the VA concluded that Mr. Kelly had a 10% disability for tinnitus and 70% disability for PTSD leading to a finding of unemployability without accounting for the conditions which the VA found not to be service connected—bi-polar disorder, bilateral hearing loss, low back condition, and Grave's disease—the ALJ's finding that Mr. Kelly is not disabled when taking into account those additional conditions could not have given sufficient weight to the VA determination. [R. 28-29]. The Court does not agree. The VA decision is entitled to *some* weight, but by no means controls the outcome of Mr. Kelly's case. The ALJ sufficiently considered the VA's decision, adjusting the RFC to a

reasonable degree but limiting the extent in light of the longitudinal record evidence.

The VA's unemployability decision explains that Mr. Kelly submitted his claim "stating that it is [his] posttraumatic stress disorder (PTSD) which is causing [him] to be individually unemployable." [R. 53]. The VA considered the PTSD examinations conducted by the VA examiners in evaluating this claim. The decision explains that "[t]he VA examiner reported on September 2015 that, '[Mr. Kelly] reports that the following symptoms have had a detrimental impact upon his ability to function in the workplace: Social isolation, chronically disturbed sleep, episodes of uncontrolled anger and rage, difficulty concentrating, obsessive hypervigilance, exaggerated startle response, and depressed mood." [R. 53]. The VA examiner went on to state that the level of the symptoms indicate that they disrupt Mr. Kelly's ability to relate to superiors and co-workers and impair his ability to accomplish tasks for which he is being paid. [R. 53]. The VA concluded, "[b]ased on the fact that the VA examiner described symptoms that are preventing you from being employable we have granted individual unemployable [sic]." [R. 53].

The ALJ gave "significant weight" to the disability rating, "as reflected in the numerous reductions in [Mr. Kelly's] residual functional capacity." [R. 22]. The rating prompted ALJ DiBiccaro to assess significant restrictions to Mr. Kelly's RFC beyond the restrictions indicated by the opinions of the other medical examiners, including those of Drs. Hill and Decarli. [R. 22]. At the same time, ALJ DiBiccaro recognized and explained the limitations of the application of the rating to the

evaluation he was tasked with. In particular, ALJ DiBiccaro explained that it has limited value in determining what work-related mental and physical activities Claimant can do given the lack of specificity in the rating's evaluation and conclusion. [Dkt. 21 at 21]. This assessment is logical. ALJ DiBiccaro considered the rating and its indications of Mr. Kelly's limited capacity but also accounted for its limited scope and context, properly supplementing his analysis with the other record evidence.

Further, as the decision explains, the rating's conclusion was based on responses provided by Mr. Kelly during the PTSD examination being conducted for the purpose of evaluating his entitlement to veterans' benefits. Mr. Kelly's self-reports as to the severity of his symptoms are less reliable than the treatment notes by APRN Coral assessing Mr. Kelly's condition over a long period of time. *See Johnson v. Comm'r of Soc. Sec.*, 669 F. App'x 580, 581 (2d Cir. 2016) (upholding ALJ's decision not to give controlling weight to medical opinion that primarily relied on claimant's self-reported symptoms); *Polynice v. Colvin*, 576 F. App'x 28, 31 (2d Cir. 2014) (upholding ALJ's decision not to give controlling weight to medical opinion where it was no more than a doctor's recording the claimant's own reports of pain); *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (finding discounting doctor's opinion not improper where it was inconsistent with his own prior opinions and was based on the claimant's subjective complaints) .

Notably, on April 6, 2016 Mr. Kelly reported he had a 70% disability rating from the VA and was trying to get a permanent and total disability rating despite the fact he was attending school to become an exterminator and talking about other

schooling and jobs, prompting APNP Coral to note that it was "unclear what his work capacity actually is." [R. 1230-31]. She also noted that it was "unclear what he wants from VA other than documentation to help [him with] whatever court cases he is facing." *Id.*

In light of the above, it was reasonable for ALJ DiBiccaro to conclude the standards for assessing SSI and VA disability differ and it was appropriate for him to limit somewhat the weight given to the VA rating in light of the longitudinal evidence. The Court concludes that ALJ DiBiccaro's treatment of the VA rating was both legally proper and supported by substantial evidence in the record.

IV.    <u>Vocational Findings</u>

Mr. Kelly argues that the ALJ's vocational findings are flawed due to his reliance on testimony by a vocational expert witness, Mr. Calandra, who testified by phone toward the end of the hearing. [Dkt. 21-1 at 31]. Claimant argues that it was inappropriate for the vocational expert to testify without having heard the evidence and based only on the ALJ's hypotheticals. *Id.* He further argues that the vocational expert's methodology, his association of the DOT number to the broader SOC code, was flawed and that his testimony as to the scale of the existence of suitable jobs is unreliable. *Id.* at 37.

An ALJ may determine whether there are significant numbers of jobs in the national economy which the claimant can perform "by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the

assumptions upon which the vocational expert based his opinion . . . and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal citations, quotations, and brackets omitted) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

The Court rejects Mr. Kelly's first argument, taking issue with the vocational expert's lack of familiarity with the rest of the hearing. "The vocational expert is just that, a vocational expert. The ALJ is responsible for determining based on all evidence, the claimant's physical capabilities." *Dumas*, 712 F.2d at 1554 n.4. The vocational expert plays no role in evaluating the medical evidence in the record. Rather, the ALJ may present hypotheticals which accurately represent his findings regarding the claimants RFC and allow the vocational expert to opine on the jobs which match that RFC available in the national economy. The vocational expert need not have been present for the entirety of the hearing in order to perform this function.

The case cited by Mr. Kelly in a footnote does not require otherwise. *See* [Dkt. 21 at 31 n. 44 (citing *Dimmett v. Colvin*, 816 F.3d 486, 488 (7th Cir. 2016))]. First, it is a decision by the Seventh Circuit, which is not binding on this Court. Even if it were, it does not challenge the vocational expert's opinion due to his lack of familiarity with the other testimony at the hearing but takes issue with the fact that the vocational expert "ignored the limitations that the administrative law judge placed on the type of job that the Claimant is able to perform." *Dimmett*, 816 F.3d at 490. As such, the Seventh Circuit case does not support reversing and

remanding the ALJ's decision based on the fact that the vocational expert telephoned into the hearing after the other testimony.

Mr. Kelly next takes issue with the vocational expert's methodology, specifically challenging whether the job of mail clerk exists in the quantity the expert represented. [Dkt. 21 at 31-38]. In response to a hypothetical from ALJ DiBiccaro, the vocational expert identified three occupations an individual with Mr. Kelly's limitations could perform—mail clerk, assembler, and solderer. [4] [R. 24-25, 119-127]. The vocational expert based this determination on his own expertise and the position descriptions in the Dictionary of Occupational Titles ("DOT"), a United States Department of Labor publication. *Id.* The DOT associates a job type with a specific code—for instance, "209.687-026 Mail Clerk"—and establishes that position's duties, including the minimum skill level and physical exertion capacity it requires. "Because of the detailed information appended to each DOT code, the codes are useful for determining the type of work a disability applicant can perform." *Brault*, 683 F.3d at 446.

"The DOT, however, just *defines* jobs. It does not report how many jobs are available in the economy." *Id.* Thus, the vocational expert turned to the Standard Occupational Classification ("SOC") system, a federal statistical standard used by federal agencies to classify workers into occupational categories. *See* Standard Occupational Classification, BUREAU OF LABOR STATISTICS,

---

[4] ALJ DiBiccaro's decision accepted the vocational expert's opinion only as to the mail clerk job, rejecting both assembler and solderer due to the loud background noise. As such, the mail clerk opinion and job numbers are the sole evidentiary basis for the ALJ's decision at Step Five. *See* [R. 25].

https://www.bls.gov/soc/. The SOC system groups together detailed occupations with similar job duties, and in some cases skills, education, and/or training. *Id.* The Occupational Employment Statistics ("OES") program then produces employment and wage estimates for the SOCs nationally, by state, and for metropolitan and nonmetropolitan areas. *See* Occupational Employment Statistics, BUREAU OF LABOR STATISTICS, https://www.bls.gov/oes/#data. The vocational expert relied on the employment data for the SOC corresponding to the DOT mail clerk position, concluding the existence of approximately 100,000 mail clerk jobs nationally. *See* [R. 24-25, 119-127].

Mr. Kelly first suggests that the DOT position number associated with the identified job of mail clerk (209.687-026) "cross-walks," or lines up with, SOC 43-9051, "Mail Clerks and Mail Machine Operators, Except Postal Service," rather than SOC 43-5053, "Postal Service Mail Sorters, Processors, and Processing Machine Operators," which the vocational expert initially identified. [Dkt. 21 at 33]. Mr. Kelly does not provide a source for this assertion. However, O*Net OnLine provides a crosswalk search function by which the Court was able to enter the mail clerk DOT and return the associated SOC(s). *See* Crosswalk Search, O*NET ONLINE, https://www.onetonline.org/crosswalk/. The search provided one matching classification, 43-9051, as Mr. Kelly asserts. *See id.* at https://www.onetonline.org/crosswalk/DOT?s=209.687-026&g=Go. This shows that the vocational expert cited the wrong SOC.

Mr. Kelly then argues that the correct SOC, 43-9051, encompasses fourteen DOT-specified occupations, eight of which do not satisfy the hypothetical posed

by the ALJ.  [Dkt. 21 at 34 n.47].  Thus, Mr. Kelly suggests that, while SOC 43-9051 reports approximately 100,000 jobs, many of those can be attributed to the eight occupations which do not meet the hypothetical criteria such that only a small percentage are available to him.  [Dkt. 21 at 34-35].

The Commissioner argues that the Second Circuit has addressed and rejected a similar argument regarding vocational expert methodology in *Brault v. Social Security Administration*, 683 F.3d 443 (2d Cir. 2012).  [Dkt. 22 at 16-17].  In *Brault*, the claimant argued that the vocational expert's testimony was unreliable because "the numerical data provided by the SOC code do not enable a vocational expert to accurately determine the number of jobs within that SOC code for a particular DOT title."  *Brault*, 683 F.3d at 446-47 (quoting the claimant's memorandum) (internal brackets omitted).  The Second Circuit acknowledged that "[t]his becomes a problem if DOT titles with different exertion or skill levels map to the same SOC code," as Kelly suggests they do here.  *Id.* at 447 n.4.  On cross-examination, the vocational expert in *Brault* denied having reported the numbers for the entire SOC, claiming to have "reduced" the numbers from "the entire SOC code" to only count "jobs . . . that I know exist."  *Id.* at 447.  The Second Circuit affirmed the ALJ's decision, finding his reliance on the expert's testimony was supported by substantial evidence.  *Id.* at 448.  The Second Circuit explained that the "substantial evidence" standard provides for the review of "the entirety of the VE's testimony, including the expert's methods, to make sure it rose to the level of 'substantial' evidence."  *Id.* at 450.  Without deciding the extent to which an ALJ must test the reliability of an expert's testimony, the Second Circuit specified that

it was not holding that an ALJ *never* need question reliability but noted that "evidence cannot be substantial if it is 'conjured out of whole cloth.'" *Id.* (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

Mr. Kelly argues that the vocational expert's testimony here "was conjured out of whole cloth and is entirely unworthy of any belief whatsoever." [Dkt. 21 at 38]. The Court recognizes the significant shortcomings in the vocational expert's testimony in this case and concludes that remand is required given the resulting absence of substantial evidence supporting the ALJ's decision at Step Five of his analysis.

As the *Brault* Court explained, data aggregation, including the many-to-one mapping used by the vocational expert to associate DOT titles to SOC codes, "necessarily creates information loss." *Brault*, 683 F.3d at 447 n.4. Despite this, the *Brault* Court, and others, have upheld decisions relying on vocational expert testimony when the expert accounts for that information loss in some reliable manner. *Id.*; *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009) (upholding decision where "the vocational expert acknowledged that the data on which she relied in determining the existence of 'charge-account clerk' positions . . . also encompassed approximately 59 other DOT titles" but "arrived at her estimated figures for charge-account clerk positions by discounting from the total numbers for all 60 DOT titles"); *Fox v. Comm'r of Soc. Sec.*, No. 6:02-cv-1160, 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009) (upholding reliance on expert testimony that "surveillance system monitor" jobs was a small percentage lower than the 132,980 "Protective Service Occupation" jobs in the national economy); *Jones-*

*Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012) (upholding reliance on vocational expert testimony estimating, based on her personal knowledge and expertise, the occupational projections for identified DOTs with the BLS providing a starting point). In contrast, courts have remanded the Commissioner's decision in cases where the vocational expert relied on incidence data for broad occupational groups that included positions other than those the claimant could perform *without* offering an opinion as to how many positions existed for the jobs the claimant could perform. *See Rosa v. Colvin*, No. 3:12-cv-0170, 2013 WL 1292145, at *9-10 (N.D.N.Y. Mar. 27, 2013); *Johnson v. Barnhart*, 378 F. Supp. 2d 274, 283 (W.D.N.Y. 2005).

The vocational expert's testimony here falls into the latter category. The vocational expert testified that he believes that DOT 209.687-026, the mail clerk title, is reasonably included in SOC 43-5053, which lists approximately 96,000 corresponding jobs in the national economy, as well as SOC 43-9051, which lists approximately 100,000 corresponding jobs in the national economy, but did not address the fact that only one of those is an established "crosswalk." *See* [R. 126]. Even if he had cited the correct classification, he did not account for the fact that SOC 43-9051 covers DOT positions in addition to mail clerk which Kelly may not be able to perform given his RFC. Indeed, the vocational expert testified that he "would have no idea" how many other occupations are listed in each of the SOCs at issue. [R. 126]. He made no effort to identify any additional DOTs and determine whether they would qualify under the hypotheticals posed or discount the total number of jobs based on the inclusion of the additional titles. He relied only on his

assessment that "[t]he essential duties are described under both of those SOC code numbers" and are "very consistent with the DOT code number" for mail clerk, such that "either one you want to reference" there are approximately 100,000 jobs nationally. [R. 126-27].

The ALJ based his conclusion that significant numbers of potential jobs exist in the national economy on the vocational expert's testimony. [R. 25]. But as a result of multiple flaws in the vocational expert's analysis, it is unclear from that testimony how many jobs would actually be available to Mr. Kelly. As a result, the ALJ's decision at Step Five lacks the support of substantial evidence and remand is required for further consideration of the existence of positions in the national market which Mr. Kelly is capable of performing.

<u>Conclusion</u>

For the aforementioned reasons, the Court DENIES the Commissioner's Motion to Affirm the Decision of the Commissioner, [Dkt. 22], and GRANTS Claimant's Motion to Remand, [Dkt. 21]. The Clerk is directed to close this case.

IT IS SO ORDERED

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

Dated at Hartford, Connecticut: March 25, 2019